IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAVIRAJ MOHIL, et al., etc.,      )
                                  )
                Plaintiffs,       )
                                  )
     v.                           )     No.  07 C 1600
                                  )
JILL GLICK, et al., etc.,         )
                                  )
                Defendants.       )

**MEMORANDUM OPINION AND ORDER**

Raviraj Mohil and Christina Mohil, on behalf of themselves and their minor children Olivia and Hari (collectively termed "the Mohils" and all individually referred to, for simplicity, only by their first names), sued Jill Glick ("Dr. Glick") and the University of Chicago Medical Center (the "Hospital"), charging that Dr. Glick and the Hospital had violated 42 U.S.C. §1983 ("Section 1983") by depriving them of rights secured by the Fourth and Fourteenth Amendments. On April 23, 2007 Dr. Glick and the Hospital moved to dismiss the Complaint, arguing (1) that they were not state actors and hence not constrained by Section 1983 and (2) that if they were held to be state actors, they were entitled to qualified immunity. After Mohils had filed a response, this Court orally rejected both of those efforts to cut Mohils off at the pass via Fed. R. Civ. P. ("Rule") 12(b)(6):

   1. With Mohils' allegations accepted as gospel, together with their receiving the benefit of reasonable inferences, both as called for by Rule 12(b)(6)

jurisprudence, the allegations sufficed to provide a plausible assertion of state action by both defendants.

2. Mohils had also identified clearly established constitutional rights so that, depending on how the facts of the case developed, they might well be able to prove a violation of those rights, hence negating the early availability of qualified immunity.[1]

Thereafter the parties engaged in prolonged discovery to flesh out the facts, ultimately resulting in their joint production of a proposed Final Pretrial Order ("FPTO") looking to trial of the case. This Court entered the FPTO on August 24, 2011, and in the course of the conference that always antedates and culminates in such an entry, defense counsel announced their intention to renew those same motions, this time with the benefit of a full airing of the facts developed during discovery. This Court scheduled the briefing of those motions as part of the pretrial motion-in-limine practice, and the two motions are now fully briefed as Dkt. Nos. 89 and 90 and ripe for disposition

---

[1] That ruling anticipated the statement in <u>Pearson v. Callahan</u>, 555 U.S. 223, 238-39 (2009) that "[w]hen qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify." As Judge Easterbrook had earlier observed in his concurrence in <u>Jacobs v. City of Chicago</u>, 215 F.3d 758, 775 (7th Cir. 2000):

> Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal.

2

under Rule 56.

What follows then is a recital of the parties' joint statement of stipulated facts, followed in turn by the analysis of the legal issues in light of those facts. Because that analysis shows that even though Dr. Glick and the Hospital are indeed state actors (a conclusion as to which there may be some difference of opinion), they are entitled not only to qualified immunity in that capacity, but actually to absolute immunity.

That being so, Mohils do not have a viable claim under Section 1983. So this action must be and is dismissed, with all remaining motions in limine by both sides being denied as moot.

**Facts**

Raviraj and Christina have two children, Olivia and Hari (SUF ¶¶3-4).[2] Olivia was born on April 25, 2005 (id. ¶18).[3] Just a week later (on May 2) Raviraj and Christina brought Olivia to the emergency room at Hinsdale Hospital and told doctors that she had fallen from a kitchen counter (id. ¶19). Neither had witnessed the fall, but they reported that Hari had pulled Olivia

---

[2] All citations to the parties' Statement of Uncontested Facts (attached as Ex. A to defendants' Motion in Limine No. 1, Dkt. 90) will appear as "SUF ¶--." Because the parties have submitted separate memoranda in connection with each motion in limine, citations to defendants' memoranda will simply take the form "D. Mem. --," and citations to Mohils' responsive memoranda will simply take the form "M. Mem. --," without any need to differentiate them further.

[3] Further references to events during 2005 will omit mention of the year.

down (id.).  After the hospital x-rayed Olivia's spine and performed a CT scan on her head, the doctors there saw no damage reflected on the x-ray or CT scan (id.).

On June 17 Christina brought Olivia to her pediatrician, Dr. Limaye, who found the baby to be in normal health (SUF ¶21).  On June 30 Christina went to see her obstetrician, who noted that Olivia was "good and easy to care for" but that Christina "can't stop crying" and "feels depressed" (id. ¶22), as a result of which the obstetrician decided that Christina was suffering from post-partum depression and prescribed Prozac for her (id.).  That diagnosis was later confirmed by a psychiatrist (id. ¶23).

On July 14 Christina left Hari and Olivia with a 12-year-old girl, whom she and Raviraj had hired to watch the children (SUF ¶25).  Christina went to a therapy appointment and then visited a store (id.).  When the babysitter called Christina and reported that Olivia was acting strangely and not moving her arms or legs (id.), Christina returned home to find Olivia unresponsive.  She called 911 (id.).  Paramedics took Olivia to Hinsdale Hospital, but Christina did not accompany her in the ambulance, instead waiting for Raviraj to return home (id. ¶27).  When he did, the couple went to the hospital, arriving roughly 15 minutes after Olivia (id. ¶28).

Doctors at the hospital found that Olivia had abrasions to her forehead and abdomen, subdural hematomas (bleeding in the

4

brain), and bilateral retinal hemorrhages (bleeding into the retinas in both of her eyes)(SUF ¶28). Those injuries were reported by an ER nurse at Hinsdale Hospital to the Illinois Department of Children and Family Services ("Child Services"), a state agency charged with protecting children from abuse and neglect (id. ¶¶9, 29). That triggered an investigation by Child Services, the Burr Ridge Police Department, the Du Page County Children's Center and the Du Page County State's Attorney's Office (id. ¶29). Meanwhile Hinsdale Hospital concluded that it lacked the medical facilities necessary to treat Olivia, and it transferred her to the Hospital (recall that this opinion uses that capitalized term to refer to the University of Chicago Medical Center)(id. ¶30).

Part of the Hospital is its Children's Hospital, and one department within the Children's Hospital is called the Department of Child Protective Services ("Department") (SUF ¶7).[4] Child abuse investigations require the police and various state agencies to speak to a number of different hospital workers (Glick Tr. 11-12), and the Hospital established the Department to coordinate the flow of information from hospital workers to the

---

[4] There is confusing overlap between the names of state entity Child Services and private actor Department of Child Protective Services. For purposes of this opinion the reader should keep in mind that the term "Department" refers to a unit of a private entity (the Hospital), while "Child Services" denotes a state agency.

5

police and state agencies (id. 14-15).

In addition, the Hospital also participates in a state-run program called the Multi-disciplinary Pediatric Education and Evaluation Committee ("Committee"[5])(SUF ¶8), created in 2001 to provide a network of physicians skilled in the detection of child abuse (id. ¶11). Those physicians evaluate potentially abused children to determine whether the medical evidence supports an inference of child abuse (id.). They provide their opinions to Child Services and the police, and they serve as expert witnesses in legal proceedings instituted by Child Services (id.).

To that end the Hospital receives money from the Cook County Children's Advocacy Center, a state agency, in exchange for its doctors providing their expert review and consultation for the Committee (Glick Tr. 19, 41-42). Their contract calls for such expert consultation as to children under the age of three who reside in Chicago (id.).

When Olivia was brought to the Hospital, Dr. Glick was both the director of the Department and under contract to provide services for the Committee (Glick Tr. 19, 41-42). Dr. Glick performed such services for both the Child Protective Services Department and the Committee, looking for medical evidence of

---

[5] Although the Committee is commonly known by its acronym "MPEEC," this Court's distaste for alphabet-soup designations (particularly when the acronym is unpronounceable) usually leads it to employ a common English word instead.

6

child abuse and relaying her findings, as well as the findings of her colleagues, to the police and other state agencies (id. at 42-43; SUF ¶¶7, 11).

Because the nurse at Hinsdale Hospital had referred Olivia's case to Child Services, team members from the Department, including Dr. Glick, examined her (SUF ¶31)(that work was not part of Dr. Glick's work for the Committee as such, because Olivia was not from Chicago)(id.). On July 15 Dr. Glick noted that Olivia had "traumatic brain injury" and that the doctor needed to "await retinal exam, review of medical records, review imaging with radiology and [neurosurgery]" (id. ¶34).

Another physician at the Hospital, Dr. Greenwald, conducted a retinal exam the same day. Finding extensive retinal hemorrhaging, he noted that "these findings are virtually diagnostic of shaking injury. No other reported cause of the picture in an infant of this age" (SUF ¶33). After further observation of Olivia, Dr. Glick concluded that Olivia's injuries had resulted from abuse (id. ¶39). She reported her conclusion during a teleconference with the DuPage County Children's Center, Child Services, the Burr Ridge Police Department and the DuPage County State's Attorney's Office (id.).

Dr. Glick then made a written report of her findings and faxed it to those same entities--all state actors (SUF ¶40). That report included her medical findings as well as the results

7

of interviews conducted by social workers and medical staff in the Hospital (id. ¶41). Dr. Glick's report also noted that Christina had postpartum depression, had failed to accompany Olivia to the hospital and had supposedly taken a shower before going to the hospital (id. ¶43). Dr. Glick excluded the May 2 fall as a cause of Olivia's injuries, based on her examination of the images and associated report generated at Hinsdale Hospital after the fall and based on her review of the images with a doctor from Hinsdale Hospital (id. ¶42).

On July 28 the police and various state agencies met to discuss the case. They agreed that they suspected Christina of abusing Olivia but could not be sure without further investigation (SUF ¶46). Despite that uncertainty, a Child Services worker decided to seek protective custody for Olivia (id. ¶47). Shortly thereafter someone advised Raviraj and Christina that Child Services would seek protective custody of Olivia and that the State's Attorney planned to file criminal charges against them (SUF ¶48). They hired a lawyer.

Olivia was discharged from the Hospital on August 2 (SUF ¶49). Before her discharge Child Services presented Christina and Raviraj with a safety plan--a written agreement to place Olivia and Hari in the custody of relatives, with limited visitation from Christina and Raviraj (id. ¶49). They signed the plan (id.).

On August 4 the State's Attorney filed an Abuse and Neglect Petition in the Circuit Court of DuPage County, alleging that Olivia was an abused and neglected minor and that Hari was a neglected minor and seeking protective custody for both children (SUF ¶50). There was a hearing on that Petition the same day, with Christina and Raviraj present and represented by counsel (id. ¶51). At the conclusion of the hearing the court put the children in protective custody, because Olivia "had sustained serious injuries while in the care of her parents" (id. ¶51).

Months later, on March 21, 2006, Christina pleaded guilty to one misdemeanor count of child endangerment (SUF ¶55). She was fined and placed on probation (id.). Further juvenile court proceedings took place sometime after that, with the parties stipulating to the evidence presented at the earlier August 4 hearing (id. ¶56). Those proceedings resulted in a court order to Child Services to reunite Olivia and Hari with Raviraj and to develop a safety plan for Christina (id.). Under the new safety plan Christina was not permitted to sleep in the home with the children, but she was given the right to supervised visits with them (id. ¶57). On July 16, 2006 those restrictions were lifted (id.).

## State Action[6]

Section 1983 applies both to governmental actors and to private entities that acted "under color" of state law. Mohils concede that Dr. Glick and the Hospital are not governmental actors but assert that they acted under color of state law when examining Olivia and presenting oral and written reports to the police. Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) succinctly summed up the standard for deciding when a private entity acts under color of state law:

> Thus, we say that state action may be found if, though only if, there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself."

That standard concededly "lack[s] rigid simplicity," and "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient" (id.).

Each side seeks to call to its aid caselaw that assertedly deals with analogous situations and that assertedly supports the desired result--state actor status for Dr. Glick and Hospital as urged by Mohils, or no such status as urged by Dr. Glick and

---

[6] That term and its counterpart "state actor" are not of course to be taken literally. Instead they are the customary shorthand terms for activities and persons functioning as part of governmental activity at any level of government other than federal--whether state, city, municipal or any other instrumentality less comprehensive in scope. That generic usage applies throughout this opinion.

10

Hospital.  By the same token, each side denigrates as nonanalogous the caselaw authority advanced by the other.  Shades of the approach brilliantly described in the late great Edward Levi's seminal article Introduction to Legal Reasoning[7] as the means by which legal doctrine changes shape!

In fact all such attempted analogies are imperfect, as we learn in law school and as we practice professionally via the process of distinguishing earlier precedents.  Here it is far more constructive to examine the core values that are served by the concepts at issue.

In that respect it is not merely tautological, but rather a truism, to recognize that a "state actor" is someone who participates in "state action" in a meaningful and essential way.  Take the governmental function of seeking to prevent, or to deal with, child abuse.  It would of course be intolerable to permit amateurs--lay personnel--to reach judgments independent of skilled medical evaluations and to make those amateur judgments the basis for separating children from their parents.  Instead

---

[7] This Court was privileged to have had that tour de force by then Professor Levi (later Dean of the Law School, President of the University of Chicago and United States Attorney General) published during its own tenure as Editor-in-Chief of the University of Chicago Law Review (15 U. Chi. L. Rev. 502 (1948)).  Later that work, which demonstrates graphically that so-called "legal reasoning" fails to satisfy the rigorous elements of logical proof, as explained in Logic 101 and advanced courses on the subject, was published in book form.

11

the expertise of medical professionals necessarily plays a key role--in many ways, the most important role--in evaluating both the effects and the causes of child abuse.

In short, it cannot be disputed that the governmental task in the field of child abuse could not function responsibly without the invaluable input provided by medical professionals. And when those professionals are not themselves governmental employees, it is equally beyond dispute that the interrelationship between those professionals and the purely governmental people involved in the decisionmaking process is truly a close entwinement (the word repeatedly used in <u>Brentwood Academy</u> as meeting the state-actor test). Whether because the recruiting of top people to fulfill the medical professionals' function on a full-time basis would not have been feasible, or for some other reason or congeries of reasons, that is obviously why the Committee contracted for such service from Dr. Glick and the Hospital, rather than hiring staff doctors (who would by definition have been "state actors").

Nor is there any legitimate basis for arguing that different treatment, or a different analysis, is called for because Olivia does not reside in Chicago and therefore was not evaluated when Dr. Glick and the Hospital might be said to have been wearing their contractual hats. There is no gainsaying the fact that they were brought into the process for exactly the same reason,

and to perform exactly the same function, as under the contract, and to do so precisely because their expertise was vital to, and an integral part of, the governmental act--and therefore they are by definition "state actors" for Section 1983 purposes.

### Immunity

But Mohils have cleared that state actor hurdle only to fall at the next: the need to avoid foundering on the shoals of immunity--not just qualified immunity, but absolute immunity.[8] This opinion turns then to that issue.

As for qualified immunity, Pearson, 555 U.S. at 232 teaches that on such a claim a court "must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right" and also "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Mohils fail on the first of those two requirements: As now fully developed, rather than in the initial threshold Rule

---

[8] This Court is aware that Richardson v. McKnight, 521 U.S. 399 (1997) has been understood to hold that private entities who act under color of state law are not entitled to qualified immunity, though some cases limit its reach to the specific facts of that case, in which a private firm managed a prison with limited government supervision. Questions regarding the reach of Richardson as to qualified immunity in a case such as this one may perhaps be clarified in the recently argued Filarsky v. Delia, United States Supreme Court Docket No. 10-1018. But how Filarsky is decided is irrelevant here, because as discussed later Dr. Glick and the Hospital are entitled to absolute immunity.

13

12(b)(6) terms (see the introductory explanation in this opinion), the facts do not make out a violation of a constitutional right.

Raviraj and Christina claim that Dr. Glick violated three constitutional rights: their fundamental right to familial relations, their right to due process before the seizure of their children, and Olivia's and Hari's Fourth Amendment rights to be free from unreasonable seizures. Those alleged violations stem from Dr. Glick's medical opinion that Olivia's injuries were inflicted, which Mohils say was biased and "failed to meet the standards of evidence based medicine" (M. Mem. 11).

Analysis of Mohil's contention reveals that they have really advanced a state law negligence or medical malpractice claim masquerading as a constitutional violation. Nothing that Dr. Glick did in her investigation or report deprived Mohils of any constitutional right.

To understand why, it's helpful to start with a brief chronological recapitulation of the events leading up to Olivia's and Hari's placement in the custody of a family member.[9] From July 14 until August 2 Olivia was in the hospital and Hari was with his parents--hence there was plainly no governmental seizure, and thus no constitutional violation, during that time.

---

[9] Once again dates without a year designation denote occurrences during 2005.

14

Then on August 2 Child Services presented Mohils with a safety plan--an agreement by which the State agreed to postpone placing the children in foster care and Mohils agreed to place the children in the care of relatives and limit their visitation of the children. Safety plans are voluntary, which is why Dupuy v. Samuels, 465 F.3d 757, 761 (7th Cir. 2006) ruled that safety plans do not infringe any substantive rights of parents. So there's still no constitutional violation as of August 2.

Then on August 4 the Mohils had a hearing at which a judge determined that Olivia and Hari should be placed in protective custody because Olivia "had sustained serious injuries while in the care of her parents," a finding that was confirmed on March 21, 2006 when Christina pleaded guilty to one misdemeanor count of child endangerment (SUF ¶55). So Mohils received notice and a hearing at which they were represented by counsel (satisfying their right to due process), and their children were "seized" (in the language of the Fourth Amendment) based on a factual finding that they do not contest even today (putting to rest any question of a Fourth Amendment violation or a fundamental right violation).

But Mohils have a claimed answer: the principle announced in Brokaw v. Mercer County, 235 F.3d 1000, 1012 (7th Cir. 2000) that "[a]n official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably

15

should have known would cause others to deprive plaintiff of constitutional rights." According to Mohils, Dr. Glick's report caused Child Services to seek custody of Olivia and Hari and caused the court to rule in the state's favor. In those terms she assertedly set into motion the events that resulted in Olivia's and Hari's forced separation from their parents, a constitutional violation.

That position is seriously flawed, with its principal substantive defect being its premise that the seizure of Olivia and Hari violated the Constitution. It didn't. Indeed, Brokaw, id. at 1019 expressly confirmed that "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse" suffices to justify the seizure of children under both the Fourth Amendment and the fundamental right analysis. And on that score (essentially a probable-cause standard) Siliven v. Ind. Dep't of Child Servs., 635 F.3d 921, 927 (7th Cir. 2011 (internal citations and quotation marks omitted)) has recently reconfirmed:

> But, while probable cause requires more than bare suspicion, it does not demand probability or even a showing that the officer's belief is more likely true than false. Moreover, probable cause need not be based on evidence sufficient to support a conviction.

In this instance there was clearly probable cause to support the initial decision to seek to remove Olivia and Hari from the

16

custody of Christina and Raviraj. Olivia had been injured twice while in the care of her parents. That was enough to provide probable cause for the belief that Olivia and Hari were in danger of future injuries. Dr. Glick's report hypothesized that Olivia's injuries had been intentionally inflicted, perhaps by Christina who had recently been diagnosed with post partum depression and had taken some questionable actions in the recent past (such as ignoring a pediatrician's advice to take Olivia to the emergency room). But even without Dr. Glick's report, there was probable cause to seek the children's removal from Christina's and Raviraj's care when one of the children had been severely injured on their watch.

What's more, no actual seizure occurred until after Mohils had received a hearing--recall that before the hearing the parents had voluntarily relinquished custody of their children by signing the safety plan. So to the extent that Mohils were assertedly injured by Dr. Glick's report, it had to have been solely as a result of the use of the report at the hearing.

That, however, actually spells defeat for Mohils' claim, for reasoned court decisions require that witnesses put their best foot forward at hearings and present the judge with their unvarnished views of the facts, unencumbered by a fear of future liability for their testimony. So cases such as Manning v. Miller, 355 F.3d 1028, 1031-32 (7th Cir. 2004) hold that

17

testimony in court is protected by immunity--immunity that is absolute and not qualified. And although Dr. Glick did not testify in person at the hearing, Giffin v. Summerlin, 78 F.3d 1227, 1231 (7th Cir. 1996)(per curiam) holds that "[t]he policy considerations underlying witness immunity for testimony in open court apply with equal force to other forms of testimony such as depositions and affidavits." Dr. Glick is thus absolutely immune to claims of damage from the introduction of the report at the hearing, and the Hospital--whose fate is inextricably linked to hers for purposes of this case--is likewise absolutely insulated against Section 1983 liability.

In a sort of fallback argument, Mohils say that they could not contest Dr. Glick's findings because they did not have enough time to review her report before the hearing (M. Mem. 16). In his deposition testimony, the attorney who represented them at the hearing said that he did not think that he could get a long enough continuance to mount a serious challenge to the report (id.). That was a strategic decision that the attorney was entitled to make, but it too cannot justify an award of damages against Dr. Glick in the face of her absolute immunity.

**Conclusion**

Although the Dr. Glick-Hospital Motion in Limine No. 1 (Dkt. 90)--that dealing with the "state actor" issue--is denied, their Motion in Limine No. 2 (Dkt. 89)--that asserting immunity--is

18

granted, albeit on a somewhat different basis.  And that means Mohils have no claim for relief under Section 1983.  Hence the entire action must be and is dismissed with prejudice.  That in turn means that all other motions in limine by each side (Dkt. Nos. 82-85 by Mohils and Dkt. Nos. 87, 88 and 91 by Dr. Glick and the Hospital) are denied on mootness grounds.

```
                        _____
                        Milton I. Shadur
                        Senior United States District Judge
```

Date:  February 1, 2012